UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>    Plaintiff,<br><br>    and<br><br>JANICE LENOIR,<br><br>    Plaintiff-Intervenor,<br><br>    v.<br><br>WALSH CONSTRUCTION COMPANY OF ILLINOIS and WALSH/II IN ONE JOINT VENTURE ,<br><br>    Defendants. | No. 03 C 3601<br>Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

The Equal Employment Opportunity Commission ("EEOC") filed suit against Walsh Construction Company of Illinois and Walsh/II In One Joint Venture ("Defendants") alleging sexual harassment in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000 *et seq*. Janice Lenoir ("Lenoir") subsequently intervened. Together, the EEOC and Lenoir allege that Lenoir's supervisor, Manuel Lemus, subjected her to sexual harassment and created a hostile working environment. Lenoir also asserts a state law claim for intentional infliction of emotional distress. Defendants seek summary judgment of the claims on the grounds that Lemus's conduct was not sufficiently severe or pervasive to be actionable, that Lenoir's complaints about the harassment were promptly and properly addressed, and that Lenoir failed to comply with

Defendant's sexual harassment policy when reporting Lemus's behavior. Both the EEOC and Lenoir (hereinafter "Plaintiffs") object to summary judgment.

***Summary Judgment Standard***

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether any genuine issue of material fact exists, all facts must be construed in the light most favorable to Lenoir and all reasonable and justifiable inferences drawn in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A material fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

***Factual Background***

Lenoir was employed by Defendants from November 2000 until January 2002 as a construction laborer at Chicago's Millennium Park. When Lenoir began working for Defendants, Mike Coghlan ("Coghlan") was the project superintendent. Xavier Watkins ("Watkins") was a carpenters' foreman. Manuel Lemus ("Lemus") began working at the site in January 2001 and became Lenoir's immediate supervisor. Lemus was a laborer's foreman and supervised Lenoir. Although Watkins did not supervise Lemus, Lenoir believed that Watkins was senior to Lemus in the chain of command because Watkins provided Lemus with work assignments.

Lenoir alleges that Lemus sexually harassed her on multiple occasions between February 15, 2001 and approximately October 25, 2001. On February 15, 2001, Lemus approached Lenoir

and told her that he and his wife did not have a good sex life, and that he wished he had met Lenoir before he met his wife. He then asked whether Lenoir and her boyfriend had a good sex life. The following day Lemus asked Lenoir is she would "take care of him," which Lenoir interpreted as a request for sexual favors.

On February 26, 2001, Lemus walked up behind Lenoir while she was seated in an office doing paperwork and rubbed his penis on her shoulder. Lenoir jumped up and ran out of the office. Lenoir reported this incident to Watkins the next time she saw him at the work site; she may also have informed him of Lemus's comments on February 15 and 16.[1] Watkins assured Lenoir that he would "get to the bottom of this."

Less than a week later, on March 2, 2001, Lemus phoned Lenoir and asked her if he could come over to her home to have sex with her. Lenoir refused and hung up the phone. Lemus phoned Lenoir several times that night asking for sex. On March 5, 2001, Lenoir told Watkins about the phone calls. Lenoir also discussed these incidents with Jerome Johnson, a fellow laborer at the job site who was also the union steward. Johnson told Lenoir to follow the "proper channels" and report Lemus's conduct to Watkins.

Watkins told Lenoir that he would report Lemus's conduct to Coghlan, and he did so on March 6, 2001. Watkins later told Lenoir that he and Coghlan spoke with Lemus about Lenoir's allegations. At some point, Coghlan approached Lenoir, told her that he had been informed of Lemus's conduct, and assured her that it would never happen again. Lenoir believes, but is not

---

[1] It is undisputed that at one point in her deposition Lenoir stated that she did not report Lemus's comments about his wife and his sex life to Watkins. However, in that same deposition she later testified that she told Watkins about "everything" Lemus had said and done.

3

sure, that Coghlan approached her after Lemus's March 2 telephone calls.[2] Lenoir alleges that Coghlan instructed her to report any further problems to Watkins. During the period that Coghlan remained at the site where both Lenoir and Lemus worked, Lenoir experienced no further incidents of harassment; she testified that at the time, she was satisfied with the resolution of these incidents, as the harassment appeared to have ended.

In September, 2001, Coghlan left the Millennium Park work site and was replaced by Greg Voegtle ("Voegtle"). Later in that same month, Lemus approached Lenoir at lunchtime and asked her why she was parking her car at the job site after hours. Lenoir informed Lemus that she was attending school in the evening and leaving her car on-site during her classes.[3] That evening, when Lenoir returned to the site to get her car, she saw Lemus waiting in his car. When she realized Lemus was flashing his car lights, she got into her car and left. A few days later Lenoir again left her car at work after hours. When she returned, her car was locked in; the job site was locked for the night. Lenoir assumes that Lemus locked up her car. She did not report these incidents to anyone, including Watkins, though she did ask Lemus why he locked her car in the job site.

In October 2001, Lemus and Lenoir were working together when Lemus twice hit Lenoir on the buttocks. Lenoir yelled at Lemus and moved to the other side of the machine they were moving. The very next day Lemus showed Lenoir a condom and said "come on." Lenoir

---

[2]Coghlan believes that he met with both Lenoir and Lemus and demanded that the harassment cease, but Lenoir insists that she never attended a meeting where Lemus was present and his harassment was discussed.

[3]Lenoir admits that Lemus, as a project foreman, was entitled to ask Lenoir why she was parking her car at the work site after hours.

4

reported both incidents to Watkins on October 25, 2001, the day after Lemus showed the condom to Lenoir. Watkins again conveyed Lenoir's complaints to Coghlan, but not to Voegtle. Watkins states that after this incident, he was present for a meeting with Lemus and Coghlan in which Coghlan raised his voice, listed the complaints Lenoir had made and asked Lemus what he was doing. Watkins left the meeting before it ended and does not know whether Lemus was threatened with discipline or termination.

*Hostile Work Environment*

Defendants first seek dismissal on the grounds that Lenoir failed to establish that she was subject to a hostile working environment. To sustain her claim, Lenoir must establish that she was subject to harassment because of her sex, that the harassment was "so severe or pervasive as to alter the conditions of [her] employment and create an abusive working environment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462 (7th Cir. 2002) (internal quotations and citations omitted). A hostile work environment is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). Factors influencing whether harassment is objectively offensive include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88 (quoting *Harris*, 510 U.S. at 23).[4]

---

[4] Defendants suggest an even stronger standard, arguing that a workplace environment must be "hellish" in order to be hostile. *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1995); *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003). However, *Baskerville*

No bright-line test distinguishes what is "merely vulgar and mildly offensive from the deeply offensive and sexually harassing." *Baskerville v. Culligan Int'l*, 50 F.3d 428, 431 (7th Cir. 1995) (internal quotations and citation omitted). However, it is important to distinguish "sexual assaults; other physical contact, whether amorous or hostile . . . uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures" from "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Id*. at 430 (citations omitted). *See also Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976 (7th Cir. 2000) (supervisor's inquiries into subordinate's purchase of lingerie, request to see photos of subordinate in lingerie, and request that subordinate look at photos of women in bondage not sufficient for sexual harassment claim). In *Baskerville*, comments of a sexual nature failed to create a hostile work environment when the supervisor never touched the plaintiff and did not invite her, explicitly or implicitly, to have sex with him or date him. *Id*. at 431. Conversely, "direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment." *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001) (citation omitted).

Considered as a whole, Lemus's conduct was objectively offensive. Lemus progressed from requests for sex, both at work and in telephone calls to Lenoir's home, to explicitly sexual physical contact with Lenoir's body on two distinct occasions. Lemus's acts of rubbing his penis against Lenoir and his multiple slaps to her rear-end, in combination with his repeated requests for sex, satisfy the test for objectively offensive conduct. *Cf. Adusumilli v. City of Chicago*, 164

---

and *Rogers* did not set a new standard for objectively offensive working environment. Rather, the term "hellish" was used to distinguish actionable conduct from mere vulgarity*, see* 50 F.3d at 430 ("[t]he concept of sexual harassment is designed to protect working women from the kind of male attentions that *can* make the workplace hellish for women) (emphasis added), and to emphasize that some conduct does not violate Title VII, *see* 320 F.3d at 748.

6

F.3d 353, 362 (7th Cir. 1998) ("the unwanted touching of Adusumilli's buttocks, took the relatively mild form of a poke and occurred *only once*") (emphasis added). Lenoir has also demonstrated their subjective offensiveness; she complained about these acts to a supervisor who she believed was in a position to resolve her complaints.[5]

Defendants nevertheless ask me to consider Lemus's conduct as falling into two distinct periods, each of which must be considered on their own, rather than in their entirety. Defendants also argue that they cannot be liable for Lemus's conduct in February and March because after Lenoir complained, the matter was addressed by the company and handled to Lenoir's admitted satisfaction. Construed in the light most favorable to Lenoir, the facts demonstrate that Lemus suspended his harassment after he was confronted by Coghlan. However, at roughly the same time that Coghlan moved to a different job site, his harassment of Lenoir began anew. Once the threat–and so far as the record establishes, the only possible threat–of punishment disappeared, Lemus resumed his harassment.

The six-month gap between the incidents of harassment reflects Defendants' stop-gap measure to end the harassment; *i.e.*, whatever sanctions Coghlan threatened to impose should Lemus engage in another act of harassment. Lenoir's complaints were only handled to her satisfaction for the time Coghlan remained the project manager at her job site; as soon as he left,

---

[5]Defendants imply that Lenoir's complaints were too delayed in time to reflect her subjective belief that she was subject to offensive harassment. For example, they note that Lenoir did not complain of Lemus's multiple (implied and actual) requests for sex (on February 15 and 16) until February 26, the day after Lemus rubbed his penis against her. Defendants cite no authority holding that an employee must complain of harassment on the very day it occurs to demonstrate the subjective offensiveness of the conduct. In this case, Lenoir immediately jumped up and ran out of the office where she was completing paperwork after Lemus rubbed against her, and complained to Watkins the "next time" she saw him. Therefore, she appears to have registered her dissatisfaction with Lemus's requests for sex just 10 days after his comments.

7

the harassment resumed and her "satisfaction" with the outcome of whatever discipline occurred in February/March disappeared. Because the alleged harasser was the same during both periods and because the conduct was similar during both periods (physical contact of a sexual nature, and implicit and explicit requests for sex) I am unwilling to consider the acts of harassment separately.[6]

Defendants also argue that Lenoir's failure to follow their sexual harassment reporting policy provides an affirmative defense under the *Faragher/Ellerth* line of cases. *See Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). While an employer is strictly liable for a supervisor's harassing conduct, the employer's liability is subject to an affirmative defense when no tangible employment action is taken. *Ellerth*, 524 U.S. at 765. In such a case, the employer avoids liability by showing: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Id*. Defendants contend that there are no material factual disputes with respect to either element of the affirmative defense.

I find, however, that Lenoir raised issues of fact with respect to both elements of the *Faragher/Ellerth* defense. First, Lenoir alleges that Lemus's harassment resumed at approximately the same time as Coghlan's departure from their work site. Defendants provided no evidence of the actual discipline imposed on Lemus after Lenoir's February/March allegations

---

[6]Defendants argue, correctly, that the EEOC and Lenoir failed to present any evidence that the incident in which Lemus allegedly locked Lenoir's car after-hours was based on her sex. Therefore, I do not address Lenoir's complaints about losing access to her car when considering whether there is sufficient evidence for the hostile work environment claim to survive Defendants' motion for summary judgment.

of harassment; absent such facts, I cannot determine that Defendants exercised "reasonable care" to stop Lemus's behavior. Moreover, the facts suggest that Lemus felt free to resume his harassment once Coghlan was no longer in a position to monitor his behavior.

Defendants nonetheless insist that Coghlan's response was effective and appropriate, even though, as I address shortly, they simultaneously object to Lenoir's decision to report the harassment to Coghlan through Watkins. Although Coghlan testified that he instructed Lemus to cease all harassment of Lenoir, Defendants provided no evidence that any written documentation was made of Lenoir's complaint such that future allegations of harassment (after Coghlan's departure) could be recognized as repeat accusations rather than first-time offenses. Nor is there any evidence that Coghlan followed Defendants' policy by reporting the allegations of harassment to Human Resources Director Ceska ("Ceska") or Vice President May ("May"), or created a record of the alleged harassment and his response.

The idea that Coghlan's response was effective because Lemus's harassment ceased until Coghlan moved to a different job site rings hollow. An employer's response to allegations of harassment is unreasonable if it is unduly delayed or "not reasonably likely to prevent the misconduct from recurring." *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 535 (7th Cir. 1993). Furthermore,

> [a]n employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made. We agree . . . that a court should not focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed.

9

*Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir. 1989). In this case, the only evidence regarding Defendants' response is Coghlan's testimony that he spoke with Lemus after Lenoir's complaints reached him. However, his testimony did not reveal the substance of his conversation with Lemus and what consequences, if any, might befall Lemus should the harassment continue. Moreover, there is no evidence he documented the allegations of harassment or forwarded Lenoir's complaints to anyone with responsibility for allegations of harassment. *Cf. McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (company took immediate, remedial action in response to complaint of harassment); *and Peinado v. Norwegian Am. Hosp., Inc.*, No. 99 C 3233, 2001 WL 726993, at *10 (N.D. Ill. Jun. 28, 2001) (employer's response was effective and prompt).[7] In sum, there is a genuine issue of fact as to whether Defendants' response to Lenoir's complaints of harassment was reasonable, notwithstanding Lenoir's assessment that, at a particular moment in time, she was satisfied with the company's response.

Second, Lenoir's failure to complain to Ceska and May in late 2001 was not unreasonable given Coghlan's and Watkin's earlier instructions to report any further incidents of harassment to them.[8] Lenoir admits that she received a copy of Defendants' sexual harassment policy, which

---

[7] In *Peinado*, the court held that the defendant company responded effectively and promptly when the complaining employee's supervisor scheduled a meeting with the Human Resources director the day after receiving the complaint, after which the company offered the plaintiff an opportunity to change her work location and suspended the alleged harasser for five weeks. 2001 WL 726993, at *9-10.

[8] On the one hand, Defendants seek dismissal of Lenoir's claims because she failed to follow textbook procedure in reporting Lemus's acts of harassment. On the other, Defendants argue that Lenoir's complaints to Watkins after the February/March harassment resulted in a "reasonable response" from the company exculpating it from any liability for Lemus's subsequent behavior, even though there is no evidence Coghlan followed the procedure to which Defendants seek to hold Lenoir. If Defendants' response to Lenoir's spring 2001 allegations of harassment was reasonable, it is difficult to understand (on the facts before me) why Lenoir's subsequent complaints to Watkins would be unreasonable.

directed employees to report harassment to Ceska and May, but failed to read the policy.[9] Defendants argue that "[t]he burden was therefore on [Lenoir] to avail herself of the policies and procedures that she knew were available to her, and that she knew had worked in the past," citing *McPherson*, 379 F.3d at 442. Like the plaintiff in *McPherson*, Lenoir failed to use the exact reporting procedures outlined in her employer's policies. *See id.* at 434-35. However, Lenoir did report Lemus's intimate physical contact with her to a project foreman, who promised to (and did) forward her complaint to the job site superintendent. Further, Lenoir claims she was instructed to follow that same procedure in reporting any future harassment, which she did. Lenoir availed herself of precisely the same reporting procedure that Coghlan accepted and approved of in the past: reporting her complaints to foreman Watkins.[10] For these reasons, I am unable to find that Defendants are entitled to the *Faragher/Ellerth* affirmative defense as a matter of law and decline to grant summary judgment of Lenoir's claim of a hostile work environment.

***Remedies***

Defendants also argue that Lenoir may not seek back pay or reinstatement based on the allegations contained within the complaint. This argument is not challenged by the EEOC or Lenoir. Therefore, Lenoir's remedies are limited to compensatory and punitive damages should the EEOC and Lenoir establish Defendants' liability at trial.

---

[9] Lenoir also asserts that she was not permitted to keep a copy of the policy.

[10] *Cf. McPherson*, 379 F.3d at 442 (concluding that the employer acted reasonably in maintaining and disseminating harassment prevention policy and that the employee unreasonably failed to avail herself of that policy).

*Intentional Infliction of Emotional Distress Claim*

Defendants contend that Lenoir (who is not joined in this claim by the EEOC) cannot meet the threshold for establishing a claim of intentional infliction of emotional distress (IIED).[11] In order to prove this claim, Lenoir must show that Defendants' conduct was truly extreme and outrageous, that they intended to inflict severe emotional distress (or knew that there was a high probability that their conduct would), and that the conduct actually caused severe emotional distress. *See Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (citing *McGrath v. Fahey*, 533 N.E.2d 806 (Ill. 1988)). *See also Wilson v. Norfolk & W. Ry. Co.*, 718 N.E.2d 172, 180 (Ill. 1999). Extreme and outrageous conduct requires more than a showing of typical disagreement and "job-related stress caused by the average work environment." *See Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001). Lenoir's allegations must demonstrate that Defendants' conduct was "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier*, 798 N.E.2d at 83.

---

[11]Defendants also argue that Lenoir cannot establish a claim for IIED having failed to establish facts that would support her Title VII claim. In light of my earlier holding, this argument is moot.

Although Lemus's behavior likely rose to the level of extreme and outrageous conduct,[12] Lenoir's suit does not name him as a defendant. Moreover, Lenoir produced no evidence that Defendants intended their conduct (their response, or lack thereof, to her complaints of sexual harassment) to inflict severe emotional distress upon her. At best, their conduct suggests a negligent disregard of the risks Lenoir faced by her continued exposure to Lemus's harassment; this is not enough to satisfy the intent requirement of IIED in Illinois. Construing the facts in the light most favorable to Lenoir, Defendants' response to her allegations of harassment were negligent, but not so extreme as to exceed the bounds of decency. *Cf. id*. at 83. Because Lenoir's IIED claim is misplaced, Defendants' motion for summary judgment of this claim is granted.[13]

---

[12]Defendants argue at length that Lemus's conduct could not satisfy the extreme and outrageous nature required to sustain claims of IIED. By way of comparison, Defendants rely on *Pavlik v. Kornhaber*, 761 N.E.2d 175 (Ill. App. Ct. 2001), in which a plaintiff's dismissed IIED claim was reinstated by the appellate court. The plaintiff was both a former patient and employee of the man she accused of harassment. The appellate court found that the allegations of the counselor's fourteen memos (many with explicit sexual content), the persistence of his sexual pursuit and his position as both her employer and counselor were sufficient to sustain a claim of IIED. *Id*. at 185-86. Defendants contend that Lemus's conduct lacks not only the persistence of the conduct in *Pavlik* but also the "extreme sexual nature" of that case. While the employer's written words in *Pavlik* were much more explicit, *Pavlik* also lacked the explicitly sexual contact that occurred twice in this case. Moreover, Lemus's alleged resumption of harassment soon after Coghlan departed from the scene suggests a persistence similar to that of the employer in *Pavlik*. Lemus's conduct progressed from requests for sex at work to requests for sex at Lenoir's home to intimate physical contact; several months later, he resumed his offensive physical contact and propositioned Lenoir with a condom. I suspect that Lemus's alleged conduct was sufficient to support a claim of IIED. *Cf. Lara v. Diamond Detective Agency*, 412 F. Supp. 2d 894, 900-01 (N.D. Ill. 2006) (dismissing IIED claim when it was based on comments about the employee's breasts, an attempt to peer down the employee's shirt, solicitations for dates, touching the employee's hair and daily comments about the employee's perfume).

[13]*Cf. Pavlik*, 761 N.E.2d at 185, in which the accused harasser was the named defendant of the IIED claim.

For these reasons, Defendants' Motion for Summary Judgment of Plaintiffs' claim of sexual harassment is DENIED. Defendants' Motion for Summary Judgment of Plaintiff-Intervenor's claim for intentional infliction of emotional distress is GRANTED.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: August 30, 2006